**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD FITZGERALD, | Case No. 1:21-cv-01409 JLT SAB |
| Plaintiff, | ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT IN PART |
| v. | (Docs. 33, 34) |
| CITY OF FRESNO, et al., | |
| Defendants. | |

Richard Fitzgerald was terminated from his position as a police officer in the Fresno Police Department in April 2021.  This was just a few weeks after the results of the 2020 presidential election sparked widespread and often violent protests, including the January 6 riot inside and around the United States Capitol Building.  Fitzgerald was terminated because an internal investigation revealed that he had recently been a member of the Proud Boys, had supported the use of violence against political protesters on his social media accounts, and had been involved in a violent scrum at a political rally in Sacramento.  He alleges in this case that he was terminated without due process and in retaliation for his political speech and choices of associates, citing the First and Fourteenth Amendments, and he makes other claims under state law.

The City of Fresno and three of its officials (the Mayor, the City Manager, and the Police Chief) move for partial summary judgment of Fitzgerald's federal claims against them.  Those

motions are **GRANTED IN PART**, as explained in this order: (1) the City's liability cannot be adjudicated at this stage, but it has demonstrated that Fitzgerald's damages will be limited in some respects; (2) the Police Chief and City Manager are entitled to qualified immunity; and (3) Fitzgerald has not cited evidence that could establish the Mayor's liability under 42 U.S.C. § 1983.

## BACKGROUND

Fitzgerald began working as a Police Officer for the City more than twenty years ago, in 2003.  (Doc. 37-6 at 31.)  In early 2020, he joined the Fresno Chapter of the Proud Boys.  (Docs. 37-6 at 32; 34-3 at 175.)  The Proud Boys are now infamous for the role that some of them played in the riot inside and around the U.S. Capitol building on January 6, 2021.  *See, e.g.*, *United States v. Tarrio*, 605 F. Supp. 3d 73, 78–82 (D.D.C. 2022); *United States v. Pezzola*, 531 F. Supp. 3d 139, 142 (D.D.C. 2021); *United States v. Chrestman*, 525 F. Supp. 3d 14, 19 (D.D.C. 2021).  By early 2021, many people and organizations had come to regard the Proud Boys as a "hate group, a criminal group, or a racist group," including Fresno's own Chief of Police.  (*See* Doc. 34-3 at 564–66.)  But the group was founded several years before 2021, and it was controversial even before Fitzgerald joined, when it was less well known.  *See, e.g.*, *McInnes v. S. Poverty L. Ctr., Inc.*, 811 F. Supp. 3d 1319, 1325 (M.D. Ala. 2025).

Fitzgerald first heard about the Proud Boys from an interview with one of its leaders. (Doc. 34-3 at 175.)  After "some research" and "deeper digging," Fitzgerald came to believe that the group was "basically just a men's fraternity" (*id.*), not a racist, sexist, or homophobic organization, as some had portrayed it (*id.* at 176–77).  When he joined the Proud Boys, the initiation process was uncomplicated, essentially the recitation of an oral oath, "[s]omething about being a proud western chauvinist and you're not going to apologize for creating the modern world."  (*Id.* at 177.)  He went to meetings and events, wore clothes and colors associated with the Proud Boys, got a Proud Boys tattoo, and began using the moniker "Sheepdog."  (Doc. 37-6 at 32.)  He later claimed that he "got into leadership" as well.  (Doc. 34-3 at 661.)  His involvement made him a "third degree" member; the fourth degree is highest.  (*Id.* at 183–84.)  As Fitzgerald understood it, a member could achieve the fourth degree by acting "in self-defense of others or by

extended acts of charity." (*Id.*)

With the exception of one other officer, also Proud Boys member, Fitzgerald did not reveal his Proud Boys membership to his superiors, nor to his fellow officers. (*Id.* at 177, 183, 193.) He did, however, advertise his status as a Proud Boy on several ostensibly anonymous social media accounts, where he also advocated political violence and invited California residents to contact him and join the Proud Boys. (*Id.* at 656.) "Fight antifa?" he asked on one account. "I'm your huckleberry."[1] (*Id.* at 656–57.) In another, he wrote that "Civil War 2" had started and that it was time to "step up." (*Id.* at 658.) In another, he posted a picture of a t-shirt bearing the slogan "I love my country fight me" and lamented in the caption that he was "[s]till looking for takers." (*Id.* at 659.) In yet another, he posted a picture of a shoe with Proud Boys branding and wrote in the caption, "I've been told if you kick antifa with these on, they bleed just a little more." (*Id.* at 653, 654.)

Fitzgerald created similarly provocative content before he joined the Proud Boys as well. For example, he once posted a picture of a bloody fist with the caption "Rough day at work." (*Id.* at 655) He also posted pictures of himself in a "Punisher" costume. (*Id.* at 651–52.) Fitzgerald explained in his deposition that to him, the Punisher is a comic book character, a former marine, a vigilante who uses "weapons and stuff" to avenge the death of his family at the hands of a gang. (Doc. 34-3 at 168–69.) To others, the Punisher is an antihero who has sunken to fighting crime with murder, threats, and extortion. *See, e.g.*, *Garza v. City of Donna*, 922 F.3d 626, 633 (5th Cir. 2019) (citing *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 472 n.9 (8th Cir. 2010) (Lange, J., dissenting)). One of the captions Fitzgerald attached to his photos fit that theme. He wrote that "shit is a lot easier when you can kill people," a Punisher quote, as a caption for a picture of himself in a Punisher costume, aiming a rifle. (Doc. 34-3 at 651.) In his deposition, Fitzgerald dismissed these pictures and quotes as innocuous cosplay in support of a charitable endeavor. (Doc. 34-3 at 168–69.)

In November 2020, Fitzgerald and several other Proud Boys members and "prospects" (that is, potential members) went to the "Stop the Steal" political rally in Sacramento. (Doc. 37-6

---

[1]  *See Tombstone* (Hollywood Pictures 1993).

at 33.)  He wore a mask, the Proud Boys' colors (black and yellow), and a tactical vest bearing his Proud Boys moniker, "Sheepdog."  (*Id.*; *see also, e.g.*, Doc. 34-3 at 259–76.)  At one point, he was captured on video in the midst of a violent scuffle between two opposing groups of protesters, his hands on a rainbow-colored flag, apparently pulling at it as though he was trying to take it from the woman who was holding it.  (*See id.* at 347–52.[2])  He explained in his deposition that he was trying to prevent her from hitting him with it.  (Doc. 34-3 at 189.)  Whatever his intentions, a group of several other protesters began punching and kicking the woman almost immediately after Fitzgerald laid hands on her flag, and they eventually took the flag from her.  (*See id.*)  Another man, a Proud Boys prospect named Brian who had come up to Sacramento with Fitzgerald, then handed him the flag, and he cast it aside.  (*See id.* at 189.)

Fitzgerald says he saw criminal conduct on "both sides" at the rally.  (Doc. 34-3 at 181.)  He did not report anything to his superiors or discuss what he had seen with any other authorities, such as the Sacramento Police Department officers on the scene, but he did decide that he had seen enough; he resigned from the Proud Boys the next day.  (*Id.* at 178.)  As he explained in his deposition, he was more interested in giving "back to the community" than the Proud Boys seemed to be.  (*Id.*)  He also disliked their taunting, their shouting, their violence, and he said he generally disapproved of "guys acting like jackasses."  (*Id.* at 179.)  He decided to form a new organization, the "Sons of '76," which would "focus on those core values that make America the great country that it is," including "honor, integrity, faith and patriotism."  (*Id.* at 661.)

Fitzgerald recorded a few podcast episodes for his new group over the next few weeks.  (Doc. 37-6 at 34.)  On January 3, 2021, for example, he introduced the group and its goals.  He explained that the Sons of '76, the Proud Boys, and others like them were "all in the same boat" and were paddling "toward the same goal," just in "different ways."  (Doc. 34-3 at 661.)  He agreed that "hitting Antifa" was "great" and was valuable as a "show of strength," but he thought the violent protests were not "moving any needles."  (*Id.*)  "All too often," he said, "I get these

---

[2]  At the time this order was filed, the video was available on YouTube under an account affiliated with the Sacramento Bee.  *See* Sacramento Bee, *Watch as downtown Sacramento CA Trump rally turns into a brawl*, YouTube (Nov. 22, 2020), https://www.youtube.com/

people who, you know, they'll watch TV and they'll get mad, oh, this Antifa, I'm so angry, and they reach out.  And they say man, I want to make a difference, I'm so mad.  I want to go to—to a protest and punch a guy in black." (*Id.* at 663.)  "And I tell them like okay, that's fine, like you got to find what's good for you.  We're not those guys." (*Id.*)

On January 7, 2021, the day after the riot in the U.S. Capitol, Fitzgerald recorded another episode.  (*Id.* at 666.)  He called the D.C. rioters "knuckleheads" and said what they had done was unhelpful because it was "not a good look." (*Id.* at 667.)  But he admitted "there is a part of me that does giggle a little bit when I'm watching all of these—these politicians . . . There's something that makes me giggle inside watching them actually be afraid." (*Id.* at 668) "I do get a little—little giddy inside when I see those people hiding behind walls and scared and running and in their bunkers, because that's what needs to happen.  They need to be afraid." (*Id.*)  In conclusion, he urged his listeners to "band together," "find a group, reach out." (*Id.*)  "I don't care who it is." (*Id.*)  "Everybody on the right, everybody who's a conservative, they're all paddling in the same direction." (*Id.*)  "I don't care if it's Proud Boys, Three Percenters, Patriot Prayer, Sons of 76; get involved." (Doc. 34-3 at 671.)

Fitzgerald went to another protest a few weeks later, on March 14, 2021, this time in Fresno, where he stood "near" the Proud Boys.  (Docs. 37-6 at 33; 37 at 31.)  Someone identified him and connected him to the Proud Boys and the Sacramento rally.  (*See id.* at 33–34.)  He closed his social media accounts out of his concern that he would be "doxed" (Doc. 34-3 at 170), but his posts and his connections with the Proud Boys quickly became the subject of extensive reporting in both local and national publications (*see* Docs. 37-6 at 35–36; 34-3 at 87–134.)  There were calls for his immediate termination.  (*See, e.g.*, Doc. 34-3 at 321–28.)

The Police Chief, Paco Balderrama, was quoted in several media stories.  (*See, e.g.*, *id.* 34-3 at 88.)  He cautioned that the reports about Fitzgerald were "merely allegations," and he promised a full investigation, but he acknowledged the importance of maintaining "the integrity and legitimacy of our police department." (*Id.*)  "Any allegations of actions unbecoming of a police officer or the affiliation with any alleged criminal or hate group will always be investigated and addressed." (*Id.*)  He said there was "no place in our police ranks for any biased, racist, or

5

anti-Semitic views." (*Id.*)  The Mayor, Jerry Dyer, was quoted in the news reports as well.  (*See, e.g.*, *id.* at 89.)  He described the images of Fitzgerald and the screenshots from his social media accounts as "extremely disturbing," and he said the City was taking the reports "very seriously." (*Id.*)  He said he would "not tolerate any City of Fresno employee belonging to organizations that promote views of supremacy, racism or criminal conduct." (*Id.* at 89–90.)

The Police Department commenced an internal investigation and put Fitzgerald on paid administrative leave.  (Doc. 37-6 at 34.)  It also asked the Sacramento Police Department to investigate Fitzgerald's actions at the November rally. (Doc. 36-1 at 71.)  An investigator in Sacramento concluded that there was probable cause to suspect that Fitzgerald had participated in a strong-arm robbery of the flag-bearing protester, but the victim did not want to participate in the investigation, so it soon faltered.  (*See* Doc. 34-3 at 475–83.)

In Fresno, the investigating sergeant prepared a memo informing Fitzgerald that he had "been accused of misconduct while off-duty." (*Id.* at 319.)  "Specifically, the complaint alleges you violated a criminal statute, engaged in conduct unbecoming an officer, used poor discretion, abuse of authority, and violated the Department's tattoo policy." (*Id.*)  He was "tentatively scheduled" to meet with an investigator on April 12, 2021. (*Id.*)  Before the interview, however, on April 9, the City gave Fitzgerald notice that he had been terminated effective immediately. (*Id.* at 332–55.)  It cited his membership in the Proud Boys, his presence at the November rally, the video showing him grasping at the protester's flag, and his social media posts.  (*See id.*)

Fitzgerald initially pursued an internal appeal under the Fresno Municipal Code.  (Doc. 34-3 at 356.)  But a few months later, after he received a copy of the internal investigation report, he elected to dismiss his appeal voluntarily and to pursue this lawsuit in its place.  (*See* Docs. 34-3 at 359; 36-5 at 5.)  He originally asserted seven claims.  (*See* Doc. 1 at 6–27.)  The Court dismissed some of these claims on the pleadings in a previous order.  (*See* Doc. 11.)  The following claims are currently pending:

- In claim 2, Fitzgerald alleges the City of Fresno, the Mayor (Dyer), the City Manager (Thomas Esqueda), and the Police Chief (Balderrama) deprived him of due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

6

- In claims 3 and 4, Fitzgerald alleges the same defendants retaliated against him for exercising his First Amendment rights to free speech and free association in violation of § 1983. The parties address Fitzgerald's First Amendment third and fourth claims in conjunction, so the Court will do the same in this order.

- In claim 5, he alleges the City violated his rights under the California Police Officers' Bill of Rights.

- In claim 6, he asserts a state law claim for libel against the Mayor and City.

The City and the individual defendants now move for partial summary judgment in separate motions. (Docs. 33, 34.) These motions address claims 2 and 3 only, i.e., the federal claims under § 1983. Briefing is complete, and the Court determined a hearing was not necessary. (*See* Docs. 33-1, 34-1, 35–39.)

## STANDARD OF DECISION

Federal Rule of Civil Procedure 56 gives district courts authority to grant summary judgment to a party who shows both "that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## DISCUSSION

### I.      Claims Against the City

The City moves for partial summary judgment. Its motion is limited to only some aspects of the two federal claims. The Court begins with the due process claim.

####      A.      Due Process

The City first moves for partial summary judgment in connection with Fitzgerald's claim

7

that his immediate termination violated the Fourteenth Amendment.  Under that amendment, a state may not "deprive any person of . . . property without due process of law."  U.S. Const. amend. XIV, § 1.  In California, the law gives all "permanent employees" of a public entity (i.e., those who can be dismissed only "for cause") a "property interest" in their continued employment for purposes of the Fourteenth Amendment.  *Dorr v. Butte County*, 795 F.2d 875, 876 (9th Cir. 1986) (quoting *Skelly v. State Personnel Bd.*, 15 Cal. 3d 194, 207–08 (1975)).  The parties thus agree in this case that Fitzgerald, who was a permanent employee at the time of his termination, had a property interest in his continued employment as a police officer and was entitled to due process.  (*See* Docs. 33-1 at 11; 36 at 12–13.)

The City does not currently contest Fitzgerald's allegation that he was terminated without due process.  (Doc. 14 at 4.)  The City's motion focuses solely on the potential damages that he could recover.  It requests an order confirming that if Fitzgerald does ultimately prove the City is liable, then his damages would be limited to those he incurred between April 9, 2021 (the day of his termination) and September 16, 2021 (the day the Civil Service Board confirmed that he had withdrawn his administrative appeal in favor of this lawsuit).  (Docs. 33 at 2; 33-1 at 15.)  A few more details about the relevant law are necessary to explain why the City believes this is so.

The process that is due to a government employee under the Fourteenth Amendment normally starts with "oral or written notice of the charges against him," an "explanation" of the evidence behind those charges, and "an opportunity to present his side of the story" before his termination takes effect.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  The idea is not to "definitively resolve the propriety of the discharge" in advance but rather to set up "an initial check against mistaken decisions."  *Id.* at 545–46.  Later, if this "initial check" does not lead the employer to reconsider, then there must be a more final post-termination hearing at a "meaningful time."  *Id.* at 546–47 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The remedy for an employee who does not receive this process normally has two parts: first, the defendant must go through the process that was due, and second, the defendant must compensate the plaintiff for any "damages which directly resulted from the failure to give the proper procedure."  *Brady v. Gebbie*, 859 F.2d 1543, 1551 (9th Cir. 1988).

The City assumes for present purposes that Fitzgerald could prove at trial that he did not have a chance to "present his side of the story" before he was terminated.  (*See* Doc. 33-1 at 13–15.)  The City argues that Fitzgerald did, by contrast, have an opportunity to challenge his dismissal in a post-termination administrative appeal, which he initially pursued but ultimately abandoned.  (*See id.* at 15.)  The City also cites cases in which courts have concluded that employees cannot be heard to complain about a termination hearing if they decided not to participate in it.  (*See id.* at 14.)  And finally, the City cites cases in which employees were denied an adequate pre-termination hearing but later participated in an adequate post-termination hearing.  (*See id.* at 13.)  In these cases, as it points out, the plaintiffs were entitled only to those damages that they could tie to the inadequate pre-termination hearing directly, such as backpay for the period between their termination date and the conclusion of the post-termination hearing.  (*See id.*)  And so, although the City does not spell out the logic of its position explicitly, its theory seems to have five steps:

(1)     Fitzgerald could potentially prove at trial that his termination was unjustified, that he was entitled to a pre-termination hearing, and that the City terminated him without conducting a pre-termination hearing.

(2)     It is undisputed, however, that the City offered Fitzgerald a post-termination hearing that would have been constitutionally adequate if only he had participated in it.  He decided not to participate, so he cannot prove at trial that the post-termination hearing fell short of what the Due Process Clause required.  His claim is limited to the pre-termination process.

(3)     Because Fitzgerald's due process claim is thus limited to his right to a pre-termination hearing, his remedies are limited to that right.

(4)     If Fitzgerald incurred damages after he decided not to participate in a post-termination hearing, then those damages are not attributable to his right to a pre-termination hearing, but rather to his decision not to pursue a post-termination hearing.

(5)     Fitzgerald's post-termination appeal was dismissed on September 16, 2021.  Any

9

damages he sustained after that date are attributable to his decision not to participate in the post-termination appeal, so he is not entitled to recover for any damages he sustained after that date.

This logic is sound. Fitzgerald has not cited evidence that could show the City's post-termination procedures fell short of what the Constitution requires. He does not argue it would have. It is also undisputed that Fitzgerald elected not to move forward with the City's post-termination administrative process. He dismissed his administrative appeal voluntarily. The Ninth Circuit has held in published opinions that when "adequate administrative procedures exist, a person cannot state a claim for denial of procedural rights when he has elected to forego a complete hearing." *Correa v. Nampa Sch. Dist. No. 131*, 645 F.2d 814, 817 (9th Cir. 1981) (citing *Bignall v. N. Idaho Coll.*, 538 F.2d 243, 247 (9th Cir. 1976)). Fitzgerald therefore cannot assert a successful claim about the post-termination process and cannot be awarded any damages in connection with that process. The only remedies he could obtain in this action would be those he could tie to the City's decision not to conduct a pre-termination hearing. *See Jones v. Los Angeles Cmty. Coll. Dist.*, 702 F.2d 203, 207 (9th Cir. 1983).

This Court cannot compel the City to undertake a pre-termination process now that Fitzgerald's termination is complete and several years in the past. The Court could, however, award damages, even nominal damages, to recognize any unjustified failure to conduct a pre-termination hearing. *See Carey v. Piphus*, 435 U.S. 247, 266–67 (1978); *Raditch v. United States*, 929 F.2d 478, 482 (9th Cir. 1991). And if Fitzgerald ultimately proves that his termination was unjustified, then he could be awarded more than nominal damages, such as backpay, provided of course that he connects those damages directly to his immediate termination. *See Zhang v. County of Monterey*, No. 17-7, 2021 WL 2322940, at *2 (N.D. Cal. June 6, 2021); *Collier v. Windsor Fire Prot. Dist. Bd. of Directors*, No. 08-2582, 2011 WL 4635036, at *7 (N.D. Cal. Oct. 6, 2011). Any damages award would be limited, however, because Fitzgerald elected not to pursue any further administrative process after September 16, 2021. He cannot successfully challenge the process that would have occurred after that date, so he cannot obtain any backpay or other damages in connection with events after September 16. The City's motion for partial

10

summary judgment is therefore granted in this respect: Fitzgerald's damages on his second claim against the City are limited to the period between April 9 and September 16, 2021.

### B.      First Amendment Retaliation

The City next moves for partial summary judgment in connection with Fitzgerald's claim that it retaliated against him for exercising his First Amendment rights.  The City does not dispute that Fitzgerald can pursue a First Amendment claim based on the theory that his termination was retaliatory.  The City's motion focuses on its other actions, such as its decision to put Fitzgerald on paid administrative leave during its internal investigation and not to hold a pretermination hearing.  (*See* Doc. 33-2 at 17–18.)

The City does not cite cases in which other federal courts have considered retaliation allegations in the piecemeal fashion it now proposes.  The Ninth Circuit has instead considered all of the relevant circumstances in conjunction with one another.  In *Dahlia v. Rodriguez*, for example, another case by a plaintiff police officer, the Circuit discussed a wide variety of "actions" that, together, could potentially have created the type of "chilling effect" that can support a First Amendment claim, from threats to harassment to paid administrative leave.  *See* 735 F.3d 1060, 1079 (9th Cir. 2013) (en banc).  In *Coszalter v. City of Salem*, the Circuit held similarly that the effect of several actions and decisions, taken "together," amounted to "a severe and sustained campaign of employer retaliation," without deciding whether any individual action would have sufficed on its own to support the plaintiffs' claims.  *See* 320 F.3d 968, 976–77 (9th Cir. 2003).  It will therefore be Fitzgerald's burden to prove at trial that all of the City's actions, taken together, sufficed to "chill or silence a person of ordinary firmness," not that any discrete decision or action sufficed on its own.  *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 779 (9th Cir. 2022) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 n.1 (9th Cir. 2010)).  The City's motion for partial summary judgment is denied in this respect.

## II.      Claims Against Balderrama

Balderrama asserts his qualified immunity to the § 1983 claims against him.  Defendants in his position are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the

11

time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The law is "clearly established" if "every reasonable official would understand that what he is doing is unlawful." *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al–Kidd*, 563 at 741).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). But in disputes about a defendant's qualified immunity, as in any other, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Courts must therefore take the evidence in the light most favorable to the opposing party in both parts of the two-part inquiry. *Id.* They "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004) (per curiam)).

### A. Due Process

As noted above, permanent public employees in California have a property interest in their continued employment and cannot be terminated without due process. *See, e.g.*, *Dorr*, 795 F.2d at 876 (citing *Skelly*, 15 Cal. 3d 207–08). The process that is due almost always includes an opportunity for the employee "to present his side of the story" before his termination. *Loudermill*, 470 U.S. at 546. The exceptions to this general rule are "rare." *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972). A prior hearing may not be constitutionally required if immediate action is necessary or if a hearing is impracticable, such as in wartime, in protecting the public health and safety, or when the government destroys property accidentally. *See id. (collecting authority); Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (same); *Phillips v. C.I.R.*, 283 U.S. 589, 597 (1931) (same).

In the face of this authority, Balderrama has not cited evidence proving beyond dispute at the first step of the qualified immunity analysis that Fitzgerald received the process he was due.

Fitzgerald did not have an opportunity to present his side of the story before he was terminated, he was not terminated by accident, and it is not clear beyond dispute—at least not on the record as the parties have currently presented it—that this was one of those "rare" situations in which immediate action was necessary to protect the public or to serve some other legitimate and pressing government need.  It would be reasonable to find on the current record, for example, that if Fitzgerald or the greater public were at risk if he stayed on the job, then the Police Department could have extended his leave or reassigned him to a different position until it completed the relatively simple pre-termination process that the Supreme Court described in *Loudermill*.

Although it is thus quite possible that Fitzgerald could ultimately prove at trial that he was terminated without "due process," Balderrama would still be entitled to qualified immunity against that claim unless it was clearly established that his actions were unconstitutional.  This is a high bar in any case, but it is even higher in this one.  "[B]ecause procedural due process analysis essentially boils down to an ad hoc balancing inquiry, the law regarding procedural due process claims 'can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent.'"  *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) (quoting *Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989)).

At the time of Fitzgerald's termination, the Fresno Municipal Code permitted the City to immediately discharge a permanent employee in some circumstances.  These circumstances included discharges that City officials believed were "necessary . . . as a result of accusations . . . involving . . . physical assault upon . . . a member of the public, or action which would constitute a felony or misdemeanor involving moral turpitude . . ."  Fresno City Mun. Code § 3-280(d).  There is no reason to doubt that this provision had been duly adopted, and there is no reason to suspect that Balderrama should have known that it was unconstitutional or otherwise invalid.  Fitzgerald does not contend otherwise.  (*See* Doc. 37 at 26.)  And as Balderrama explained in his deposition, he believed at the time that Fitzgerald was under investigation for participating in a violent and felonious strong-arm robbery of a protester in the Sacramento rally while he was a member of the Proud Boys, an organization that he believed was a "hate group," i.e., an

13

organization with "the ideology of either violence or hate of another particular group." (*See* Doc. 34-3 at 564, 575, 581–85.) These circumstances put Fitzgerald's case within the terms of section 3-280(d). "When a city council enacts an ordinance, officers are entitled to assume that the ordinance is a valid and constitutional exercise of authority." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 824 (9th Cir. 2013) (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994)). That is true even if a federal court later determines that the ordinance is actually unconstitutional, even on its face. *See id.*

It is also undisputed that Balderrama consulted with the City Attorney's Office before he decided to terminate Fitzgerald immediately. (Doc. 34-3 at 574.) Balderrama testified in his deposition that he relied on advice from the City Attorney's office that an immediate or "emergency" termination was a viable option in Fitzgerald's case under § 3-208(d), based on the allegations against him. (*Id.*) Consultation with an attorney does not "automatically insulate an officer from liability." *Ewing v. City of Stockton*, 588 F.3d 1218, 1231 (9th Cir. 2009). An official cannot excuse his violation of a clearly established rule simply by finding an attorney who is willing to bless the violation. *See Friedman v. Boucher*, 580 F.3d 847, 859 (9th Cir. 2009). An official's decision to consult with an attorney can show, however, that the official's decision was reasonable and in good faith, especially in a close case. *See Ewing*, 588 F.3d at 1231. Balderrama's consultation with the City Attorney's Office thus offers further support to his assertion that he was attempting to do what the City's duly enacted municipal code permitted him to do.

Finally, Balderrama explained in his deposition that when he was deciding whether to go forward with an immediate termination, he had recently met with Fitzgerald's attorney. (Doc. 34-3 at 574–75, 577–78.) After hearing what Fitzgerald's attorney said in this meeting, Balderrama understood that Fitzgerald did not intend to come back to work as an officer, intended to retire from the Police Department based on his medical conditions, and did not actually want to answer questions in an interview. (*Id.*) It seemed to Balderrama that Fitzgerald's attorney was "kind of trying to gauge the time," to see "how much time . . . we have here." (*Id.* at 578.) This led Balderrama to believe that an interview might take a long time to schedule, that Fitzgerald might

14

"make himself unavailable," and that the investigation would drag on and possibly never reach a final conclusion. (*Id.* at 576–77.) This was unacceptable to Balderrama, who believed the City and the Police Department needed to demonstrate their "integrity" and "professionalism" by completing a prompt but thorough investigation of the widely publicized videos and social media posts. (*Id.*) He testified in his deposition that "every day that we, you know, were not able to announce whether we were able to clear Officer Fitzgerald or take some other action was . . . detrimental." (*Id.* at 574.)

Fitzgerald's attorney does not remember their meeting in particular, and he does not remember whether Fitzgerald was planning to retire. (*See* Doc. 37-3 at 111–16.) He made clear in his own deposition that he would not have told Balderrama that Fitzgerald was refusing to answer questions outright, but he did not contradict Balderrama's account of their meeting; nor did he testify, for example, that Fitzgerald actually did want to come forward promptly to clear his name or prevent his termination. (*See id.*)

When this combined deposition testimony is viewed in the light most favorable to Fitzgerald, it shows that Balderrama reasonably believed at the time (although mistakenly, perhaps) that Fitzgerald did not want to come back to his job as a patrol officer or tell his side of the story but preferred instead to postpone the investigation until an interview became moot.

In total, then, when the evidence is viewed in the light most favorable to Fitzgerald, it shows that Balderrama decided to finalize the termination based on a duly enacted city ordinance that authorized immediate terminations, based on advice from the City Attorney's Office about that ordinance and his options, and based on his understanding that Fitzgerald did not wish to return to his job or come in for an interview in any event.

Fitzgerald cites no case in which the Ninth Circuit or the Supreme Court has held that an immediate termination violated the Due Process Clause in similar circumstances, certainly not cases establishing that conclusion "beyond debate." *Wesby*, 583 U.S. at 63 (quoting *al–Kidd*, 563 at 741). The Supreme Court has emphasized, moreover, that qualified immunity protects officials who make decisions based on mistaken but reasonable conclusions about what happened and what the law requires of them. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Butz v.*

*Economou*, 438 U.S. 478, 507 (1978).  Balderrama is therefore entitled to qualified immunity against the due process claim.

### B.      First Amendment Retaliation

When a local government is acting as an employer, it "may impose 'certain restraints on the speech of its employees' that would be 'unconstitutional if applied to the general public.'" *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam)).  That is because the government's interest "in regulating the speech of its employees" differs "significantly" from its interest in "regulation of the speech of the citizenry in general." *Id.* (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).  But a government cannot compel its employees "to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Id.* (quoting *Pickering*, 391 U.S. at 568).  A claim of First Amendment retaliation may therefore come down to a balancing exercise, one in which the employee's First Amendment interests are weighed against the government's "legitimate administrative interests" as an employer. *Id.* (citing *Pickering*, 391 U.S. at 391) (other citations and quotation marks omitted).

Stated formally, courts use a "two-step, burden-shifting approach" to adjudicate First Amendment claims like the one Fitzgerald asserts against Balderrama. *Id.* at 721.  It is first the employee's task to prove that he "engaged in expressive conduct that addressed a matter of public concern," that a government official "took an adverse action" against him, and that his "expressive conduct was a substantial or motivating factor for the adverse action." *Id.* (quoting *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004)).  If he carries this burden of proof, the government can avoid liability by either breaking a link in the chain of cause and effect, i.e., by showing "that it would have taken the same actions in the absence of the plaintiff's expressive conduct," or alternatively by showing that its own "legitimate administrative interests" outweigh the plaintiff's interests under the First Amendment. *Id.* (citing *Pickering*, 391 U.S. at 391) (other citations and quotation marks omitted).

The balancing exercise is "fact-sensitive" and "deferential" to the government's interests.

16

*Bd. of Cnty. Commissioners v. Umbehr*, 518 U.S. 668, 677 (1996).  For that reason, "there will rarely be a case that clearly establishes that the plaintiff is entitled to prevail" in the face of a government official's assertion of qualified immunity.  *Riley's Am. Heritage Farms*, 32 F. 4th at 729.  The employee can overcome an official's qualified immunity only by showing the balance "so clearly favored the plaintiff that it would have been patently unreasonable for the government to conclude that the First Amendment did not protect his speech."  *Id.* (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998)).

The Ninth Circuit's opinion in *Riley's American Heritage Farms*—a case with many parallels to this one—illustrates well how this test operates in practice.  The plaintiffs in that case were part of a company that hosted schoolchildren for historical reenactments of early American life.  *See id.* at 716.  Students from a local district had visited the farm for more than a decade.  *See id.*  This changed after one of the company's shareholders used his personal Twitter account to comment on a variety of controversial political topics, from "President Donald Trump's alleged relationship with Stormy Daniels," to "Senator Elizabeth Warren's heritage," to his own "opinions on gender identity."  *Id.*  Parents saw the tweets, they complained, a local media outlet picked up the story, and all future field trips were eventually canceled.  *See id.* at 716–17.  The farm and its shareholders brought a civil rights action under § 1983 against the district, members of the school board, and three administrators.  *See id.*

The *Pickering* balancing test was applicable to the case even though the plaintiffs were contractors rather than employees.  *Id.* at 722.  Genuine disputes of material fact also prevented the Ninth Circuit from resolving the underlying constitutional question at summary judgment, but the individual defendants were nevertheless entitled to qualified immunity based on their qualified immunity.  The Circuit framed the right in question very narrowly.  The question was whether "it was clearly established that a school district could not cease patronizing a company providing historical reenactments and other events for students because the company's principal shareholder had posted controversial tweets that led to parental complaints."  *Id.* at 729.  The circuit rejected the plaintiff's more general proposal: "whether it is clearly established that when a person has a pre-existing commercial relationship with a public agency, the business patronage

17

pursuant to that relationship is a valuable government benefit which the agency may not take away based on the person's First Amendment protected speech." *Id.* at 729 n.12 (alterations and quotation marks omitted).

There was no comparable case about a government's efforts to prevent a contractor's divisive speech from interrupting its operations, and certainly no case about student events, controversial tweets, parent complaints, and local media attention. *See id.* at 729–30. True, it was clearly established that "pretextual" fears and "imagined" disruptions do not outweigh an employee's First Amendment rights, but there actually had been "parent and community complaints and media attention." *Id.* at 730. This meant the defendants had "more leeway" to keep the schools running smoothly and were entitled to qualified immunity. *See id.*

This Court has discretion to adjudicate a defendant's assertion of qualified immunity solely based on the law's clarity or murkiness, without deciding whether the defendant actually violated that law. *See Pearson*, 555 U.S. at 236. That is the better avenue to a resolution of the pending motions here, given the difficult and sensitive nature of the relevant balancing test. The question is thus whether Fitzgerald has cited evidence and cases showing that balance "so clearly favored [him] that it would have been patently unreasonable for [Balderrama] to conclude that the First Amendment did not protect [Fitzgerald's] speech." *Riley's Am. Heritage Farms*, 32 F. 4th at 729 (quoting *Brewster*, 149 F.3d at 980).

The Court must begin by identifying the constitutional issue at the correct level of generality. Fitzgerald argues the question is whether a local government can retaliate against an employee for his speech without "proving that employee's actions have actually disrupted the workplace or are reasonably likely to do so in the future." (Doc. 37 at 32.) As the Circuit's opinion in *Riley's American Heritage Farms* demonstrates, the question must be defined at a much lower level of abstraction. It is whether a police department can terminate an officer who had prompted widespread public outcry by, among other things, (1) affiliating with a group known for political violence, (2) repeatedly voicing approval of political violence, (3) scuffling with protesters in a violent scrum at a recent political rally, and (4) continuing to attend political protests alongside members of the same violent group, even after claiming that he had separated

18

from it.

Fitzgerald has cited no case that could have demonstrated to Balderrama that the question was "beyond debate," *Wesby*, 583 U.S. at 63 (quoting *al–Kidd*, 563 at 741), and certainly no case showing the balance weighed so heavily in Fitzgerald's favor that terminating him was "patently unreasonable." *Riley's Am. Heritage Farms*, 32 F. 4th at 729 (quoting *Brewster*, 149 F.3d at 980). He cites only general cases about "guilt by association" and the importance of protecting those who voice unpalatable opinions. (*See* Doc. 37 at 30–33.) Balderrama is entitled to qualified immunity from Fitzgerald's First Amendment claim.

### III.   Claims against Esqueda

It is unclear what evidence Fitzgerald intends to cite at trial to support his claims against Esqueda under § 1983. Although it is undisputed that Esqueda was "ultimately the person who made the decision to agree with the termination," it is also undisputed that he did this only "in form." (Doc. 37-3 at 61). By the time he became involved, the Police Department, the Personnel Department, and the City Attorney's Office had all "vetted" and concurred in the recommendation to terminate Fitzgerald. (*Id.* at 61, 63–64.) This meant that "in substance," Esqueda was not "making the decision," but rather "following the recommendation." (*Id.* at 61.) In his words, he "was just kind of going through the form, making sure okay, they did all the work." (*Id.* at 64.) He agreed with Balderrama's and other staff members' assessment that an immediate termination was justified as a matter of form under the extraordinary circumstances and the City's municipal code. (*See id.*)

Based on this record, it is undisputed that Esqueda relied on the same information and the same reasoning as Balderrama. Esqueda is therefore likewise entitled to qualified immunity from Fitzgerald's § 1983 claims.

### IV.   Claims Against Dyer

Dyer also moves for partial summary judgment with respect to Fitzgerald's claims under § 1983. (Doc. 34-1 at 12–14.) He contends that no evidence could show he played any role in the decision to terminate Fitzgerald's employment or to deny him a hearing. (*Id.*) If that is true, then Fitzgerald could not pursue a successful § 1983 claim against Dyer. "Absent vicarious

19

liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

The relevant evidence is undisputed. Fresno's City Charter establishes what it refers to as a "Mayor-Council form of government." (Doc. 34-3 at 38.) The City's "executive power" is "vested in the office of the Mayor." (*Id.* at 39.) The Mayor is in this way "the Chief Executive Officer of the City" and is "responsible for providing leadership and taking issues to the people and marshalling public interest in and support for municipal activity." (*Id.*) By contrast, the City's "Chief Administrative Officer" or City Manager (Esqueda in this case) is "head of administrative branch of the City government." (*Id.* at 40–41.) The City Manager exercises "control over all departments, offices and agencies under his or her jurisdiction," such as the Police Department. (*Id.* at 41.) Although the Mayor appoints the City Manager and may remove the City Manager from office for any reason or no reason, the Charter expressly forbids the Mayor from interfering with the City Manager's execution of all "powers and duties," whether "directly or indirectly," including the "removal" of any employee. (*Id.*; *see also* Docs. 36-1 at 80; 36-2 at 16.) It is thus undisputed that Dyer had no authority to terminate Fitzgerald and that Dyer did not sign the order of termination. (*See* Doc. 37-6 at 4.)

On a more practical level, it is also undisputed that Dyer was not involved in any of the meetings that were a part of the Police Department's investigation into Fitzgerald's actions (Doc. 34-3 at 507), and no party has cited evidence showing Dyer played any other role in the investigation, although he did eventually discuss its results with Balderrama (Doc. 37-3 at 27). Balderrama recalls speaking with Dyer or emailing him to explain that the Police Department had decided to terminate Fitzgerald immediately with approval from staff in the City Manager's Office. (*See* Doc. 34-3 at 579–81.) He recalls that Dyer responded with one word: "Okay." (*See id.*)

Finally, the record includes a copy of Dyer's public statement about the case from the day of Fitzgerald's termination. (Doc. 37-3 at 118.) "After discussions with Chief Balderrama," he wrote, it was "clear" to him "that there were egregious violations of department policy." (*Id.*) He wrote that he was "pleased that Officer Fitzgerald [would] no longer be serving as a police officer

20

with the City of Fresno." (*Id.*) "As Mayor," he wrote, "I want to reiterate to the community that I will not tolerate any form of racism displayed by City of Fresno employees." (*Id.*)

This evidence could not support a § 1983 claim against Dyer at trial. First, Fitzgerald could not prove Dyer was liable as a supervisor or integral participant because the City Charter expressly barred Dyer from participating in or interfering with an individual employment decision. *See Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) ("[Defendants] cannot be supervisors of persons beyond their control."). Second, beyond his lack of authority, Fitzgerald has not cited evidence that could show Dyer actually planned to terminate Fitzgerald or to deprive him of a hearing, nor that Dyer "set in motion" the events that ultimately led to Fitzgerald's immediate termination. *See Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022) (rejecting integral participant claim for similar reasons). At most the evidence could show Dyer stood by as the Police Department and City Manager's Office went forward with a termination that Dyer could not interfere with but did not want to stop. This would not suffice to prove he is liable under § 1983. *See, e.g.*, *Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008) (rejecting supervisory liability and integral participation claims against officer who was ultimately "in charge" of an investigation but did not actually participate in or supervise it).

Fitzgerald also argues Dyer was part of a conspiracy to violate his constitutional rights. (Doc. 37 at 20–21.) "Conspiracy is not itself a constitutional tort under § 1983." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc). Because Fitzgerald has not cited evidence that could show any of the individual defendants are liable for violating his constitutional rights, he cannot establish that they are liable for agreeing to violate his constitutional rights. *See Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010).

## V.    Punitive Damages

Balderrama, Esqueda, and Dyer move for partial summary judgment with respect to Fitzgerald's request for punitive damages under § 1983. (Doc. 34-1 at 28–31.) Fitzgerald is not entitled to compensatory damages against the individual defendants under § 1983, so he cannot obtain punitive damages under that section. *See Riley's Am. Heritage Farms*, 32 F.4th at 730 n.13.

**CONCLUSION**

Based on the foregoing, the Court **ORDERS**:

1.       The individual defendants' motion for partial summary judgment (Doc. 34) is **GRANTED.**

2.       The City's motion for partial summary judgment (Doc. 33) is **GRANTED IN PART** as follows: the plaintiff's damages on his second claim against the City are limited to those incurred in the period between April 9, 2021 and September 16, 2021.

3.       The parties **SHALL** file a joint stipulation proposing dates for the pretrial conference and trial within 30 days. Likewise, if they believe that settlement discussions may be productive, they SHALL contact Judge Boone's chambers to place a conference on calendar.

IT IS SO ORDERED.

Dated:   **April 17, 2026**

UNITED STATES DISTRICT JUDGE

22